## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| TONEY E. PITTS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THE HOUSING AUTHORITY | ) | Civil Action: 5:06-CV-506-VEH |
| OF THE CITY OF HUNTSVILLE, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION</u>

Toney E. Pitts (hereinafter "Plaintiff") brings this action against his former employer, The Housing Authority of the City of Huntsville, Alabama (hereinafter "Defendant"), alleging race discrimination in violation of 42 U.S.C. § 1981, the Fourteenth Amendment of the United States Constitution pursuant to 42 U.S.C. § 1983, and Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. §§ 2000 *et seq.* (hereinafter "Title VII").

## I.    FACTUAL HISTORY[1]

---

[1]  These are the facts for summary judgment purposes only. They may not be the actual facts. See *Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994) ("'[W]hat we state as 'facts' in this opinion for purposes of reviewing the rulings on the summary judgment motion [ ] may not be the actual facts'")(citation omitted). Facts are undisputed unless otherwise noted. Where the facts are in dispute, they are stated in the manner most favorable to the plaintiff. See *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112 at 1115 (11th Cir. 1993).

Plaintiff, a white male, began employment with Defendant in 1978 as its Section Eight Housing Coordinator.  (Pitts Dep. pg. 16-17; doc. 1 ¶ 5).  His primary responsibility was to manage Defendant's Section Eight Housing Department.  (Pitts Dep. at 32).  He held that position during his entire employment with Defendant.  (Pitts Dep. at 32).  Plaintiff was terminated on November 18, 2004.  (Pitts Dep. at 24).

Mike Lundy (hereinafter "Lundy"), a black male, began employment as Defendant's Executive Director in February 2004.  (doc. 1 ¶ 10; Lundy Dep. Vol. 1 at 13, 16-17).  Lundy was Plaintiff's supervisor when Plaintiff was fired, and he made the decision to terminate Plaintiff.  (Lundy Dep. Vol. 1 at 71; Lundy Aff. at 3).

Defendant's main function is to provide housing assistance to qualified low-income individuals and families.[2]  (Lundy Aff. at 1).  Defendant receives most of its funding from the U.S. Department of Housing and Urban Development (hereinafter "HUD"), a federal agency to which Defendant reports.  (Id.).  HUD monitors and oversees Defendant's performance by measuring the effectiveness of its Section Eight and Public Housing departments.  (Lundy Aff. at 2).  Both programs are subject to review through HUD's Rental Integrity Monitoring (hereinafter "RIM Review").

---

[2]  Defendant is composed of two main programs: (1) the Section Eight program, which helps place eligible families in affordable and decent rental housing that is owned by a qualified third party through government subsidy, and (2) the Public Housing Program, through which Defendant owns and leases properties to eligible individuals and families.  (Lundy Aff. at 1-2).

(Id.).  HUD conducts this review to detect and reduce income and rent errors, to decrease underpayments and overpayments by residents, and to maximize HUD's limited housing resources.[3]  (Lundy Aff. at 1).

HUD also monitors the Section Eight program through the Section Eight Management Assessment Program (hereinafter "SEMAP").  (Lundy Aff. at 2). SEMAP measures performance and administration of housing choice vouchers, which are provided to eligible individuals for use toward the rent of qualified residences. (Id.).  SEMAP involves self-evaluation by the Section Eight department based on fourteen performance indicators designated by HUD.  (Id.).  The Section Eight department then generates a score, which is certified by the department as accurate to HUD.  (Id.).  HUD then conducts a limited review of the SEMAP self-evaluation, and either accepts the program's score or performs its own onsite confirmatory audit of the SEMAP.[4]  (Id.).

In 2003, the Section Eight Department's SEMAP score was 96%.  (Pl's exh.

---

[3]  In 2003 and 2004, HUD performed a RIM Review of Defendant's Section Eight and Public Housing departments.  (Id.).  The review yielded unfavorable results for both departments. (Id.).

[4]A similar assessment program is used for Defendant's Public Housing Department. (Lundy Aff. at 3).  This assessment program is called the Public Housing Assessment System ("PHAS").  (Id.).  PHAS measures the performance of the Public Housing program according to HUD's standards and requirements.  (Id.).  The Public Housing Department initially reaches and certifies its own PHAS score.  (Id.).  As with SEMAP, HUD may perform a confirmatory audit of the PHAS score.  (Id.).

D).  This score classified the department as a "high performer."  (Pl.'s exh. G).  "High

performers" qualify for national recognition and may enjoy a competitive advantage

in receiving HUD funding.[5]  (Id.).

In 2004, Defendant's SEMAP score declined to 79%.  (Pl.'s exh. D).  This

score placed the Section Eight Department into the "standard" category.  (Pl.'s exh.

G).  HUD then performed a confirmatory audit, further reducing the score to 64%.

(Id.).  The Section Eight Department was still classified as "standard," but was now

only five points away from a "troubled" status.  (Id.).  "Troubled" departments are

often subject to sanctions by HUD and reduced federal funding.  (Lundy Aff. at 2).

HUD's confirmatory audit of the Section Eight program began on September

13, 2004.  (Lundy Dep. Vol. 1 at 62).  Lundy was verbally informed of the reduction

in the SEMAP score on or about that same day.  (Lundy Dep. Vol. 1 at 61-63).  He

received formal notice of the new score on October 15, 2004, by letter dated October

12, 2004, from HUD.  (Pl's exh. 7).

That same year, the Public Housing department's PHAS score was 89.[6]  (Lundy

---

[5]  It is not clear from the record whether this "competitive advantage" is against other
municipal housing authorities or some other public agency.

[6]  The record does not specify whether a PHAS score is subject to the same rating system
as a SEMAP score, i.e., whether a PHAS score of 89 is the equivalent to a SEMAP score of the
same number.  However, in his affidavit, Lundy expressed that PHAS is the equivalent
assessment system to SEMAP for Defendant's Public Housing Department.  (Lundy Aff. at 3).
Lundy characterized the PHAS score of 89 as "satisfactory."  (Id.).

4

Aff. at 3).  HUD did not perform a confirmatory audit of this score.  (Id.).  Thus, the score was not reduced. (Id.).  Larry Pippins (hereinafter "Pippins"), a black male, was supervisor of the Public Housing department during this time.  (Id.; Pitts Dep. at 25). His employment was not terminated when his department received the PHAS score. (Id.).

Lundy was acting supervisor for both Plaintiff and Pippins in November 2004. (Lundy Dep. Vol. 1 at 73).  On November 9, Lundy gave Pippins a favorable performance evaluation and authorized him to receive a three percent salary increase. (72-73; Pl's exh. 8).

Lundy did not give Plaintiff a performance evaluation in 2004, which became due October 1.  (Lundy Dep. Vol. 1 at 58).  However, Plaintiff's prior performance evaluations had been favorable.[7]  Lundy did not look at any of Plaintiff's prior performance evaluations before he terminated him on November 18, 2004.[8]  (Lundy Dep. Vol. 1 at 74).

---

[7] In 2002 and 2003, Plaintiff's performance evaluations reflected the second-highest possible rating of "Exceeds Expectations."  (Pl's exhs. 9, 11).  In 2001, he was given the highest possible rating of "Outstanding."  (Pl's exh. 10).  In 2000, his rating was "Exceeds Expectations" (Pl's exh. 12) and in 1999 the rating was "Meets Expectations" (third highest rating out of five). (Pl's exh. 13).

[8] Plaintiff received a letter of termination from Lundy on November 18, in which Lundy described his dissatisfaction with Plaintiff's job performance as indicated by the low SEMAP score.  (Pl.'s exh. D).  That day, Plaintiff met with Lundy and Mr. Derrick Moore, Director of Housing Operations, to discuss Plaintiff's termination.  (Pl's exh. 43).  Plaintiff's termination was effective immediately.  (Lundy Dep. Vol. 1 at 153-54).

The vacancy for the Section Eight Department management position was advertised in Defendant's office and on Defendant's website beginning November 23. (Pl.'s exh. 15; Lundy Dep. Vol. 1 at 85). Only one candidate, Ms. Daphne Bradwell (hereinafter "Ms. Bradwell"), a black female, applied for the position. (Lundy Dep. Vol. 1 at 91, 133). Ms. Bradwell had previously worked at the Atlanta Housing Authority, the Dallas Housing Authority, and the Chattanooga Housing Authority. (Pl.'s exhs. 21, 24, 27). She had been terminated from the Chattanooga Housing Authority, apparently due to the poor performance of its Section Eight Department under her management. (Bradwell Aff. at 1-2). Lundy offered the position to Ms. Bradwell at the conclusion of her interview on December 1, 2004, without checking her prior employment references.[9] (Lundy Dep. Vol 1 at 95).

Ms. Bradwell began working for Defendant on December 6, 2004. (Lundy Dep. Vol. 1 at 97-98). She initially helped improve Defendant's Section Eight Department. (Lundy Dep. Vol. 1 at 129). However, Lundy became concerned about her job performance in September 2005, when a self-audit by the Section Eight Department revealed a SEMAP score of 97. (Lundy Dep. Vol. 1 at 144). When

---

[9] Lundy received positive employment references for Ms. Bradwell after he offered her Plaintiff's former position. (Lundy Dep. Vol. 1 at 116). The record does not indicate that he received any negative references for Ms. Bradwell. Despite her termination from the Chattanooga Housing Authority, no negative employment reference for Ms. Bradwell was received from that agency. (Lundy Dep. Vol. 1 at 102-03).

Defendant conducted an internal audit of that score, the actual SEMAP score was 79. (Id.).  Lundy issued Ms. Bradwell a warning letter, in which he informed her that a failure to improve her job performance within thirty days could result in her termination.  (Pl.'s exh. 29).  Ms. Bradwell resigned effective in October 2005. (Lundy Dep. Vol. 1 at 130).

Jerry Trew, a white male, now holds Plaintiff's former position.  (Lundy Aff. at 3).

## II.    PROCEDURAL HISTORY

Plaintiff filed his EEOC charge of discrimination against Defendant on April 19, 2005, in accordance with 42 U.S.C. § 2000e-5(e)(1).  (doc. 9, att. 1).  In his charge, Plaintiff alleged that he was terminated because of his race.  (Id.).  The EEOC failed to reach a judgment on Plaintiff's charge, but notified him of his right to sue via letter dated December 20, 2005.  (doc. 9, att. 3).

Plaintiff initiated the current action by filing his Complaint on March 14, 2006. (doc. 1).  Defendant filed an Answer with affirmative defenses on April 12, 2006. (doc. 4).

On January 16, 2007, Defendant filed a Motion for Summary Judgment on all of Plaintiff's claims.  (doc. 10).  Both parties have briefed the court and submitted evidentiary materials in response to Defendant's Motion. (docs. 11-12, 14-16).

## III.    STANDARD OF REVIEW

Summary judgment is proper when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  FED. R .CIV. P. 56. All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant. See *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

A plaintiff in an employment discrimination case maintains the ultimate burden of proving that the adverse employment decision was made because of intentional discrimination.  See *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 134 (2000); *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509-12 (1993); *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1184 (11th Cir. 1984).  Although the Supreme Court previously established the basic allocation of burdens and order of proof in a disparate treatment case,  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248 (1981), as modified by *Desert Palace v. Costa*, 539 U.S. 90 (2003), that allocation scheme applies only in cases where there is no direct evidence of discrimination, *Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 595 (11th Cir. 1987).

Under the *McDonnell Douglas/Burdine* scheme, a plaintiff first has the burden of proving by a preponderance of evidence a prima facie case of discrimination. Once the plaintiff proves a prima facie case, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its employment decision. Finally, if the defendant carries its burden, the plaintiff must *either* prove by a preponderance of the evidence that the legitimate reasons offered by the defendant are merely a pretext for discrimination *or* present sufficient evidence, of any type, for a reasonable jury to conclude that discrimination was a "motivating factor" for the employment action, even though defendant's legitimate reason may also be true or have played some role in the decision. *McDonnell Douglas*, 411 U.S. at 802-05; *Burdine*, 450 U.S. at 252-54; *Desert Palace*, 539 U.S. at 101-02. The court is aware that the summary judgment rule applies in job discrimination cases just as in other cases. *Chapman v. AI Transport*, 229 F.3d 1012, 1025 (11th Cir. 2000) (rejecting an earlier, contrary general rule and emphasizing that no thumb is to be placed on either side of the scale).

## IV.   ANALYSIS[10]

---

[10]  In their briefs to the court, neither party specifically addresses Plaintiff's Equal Protection claim brought under 42 U.S.C. § 1983. The Eleventh Circuit Court has instructed that claims brought under 42 U.S.C. §§ 1981 and 1983 are analyzed under the same framework as Title VII disparate treatment claims. *Stallworth v. Shuler*, 777 F.2d 1431, 1433 (11th Cir. 1985) ("Where, as here, a plaintiff predicates liability under Title VII on disparate treatment and also claims liability under sections 1981 and 1983, the legal elements of the claims are identical.

42 U.S.C. § 2000e-2 provides that "[i]t shall be an unlawful employment practice for an employer . . . to discharge any individual . . . because of such individual's race, color, religion, sex, or national origin."  Plaintiff's Title VII claim alleges disparate treatment based on his race.

In *Knight v. Baptist Hosp. of Miami, Inc.*, the Eleventh Circuit Court explained the applicable standard for evaluating race discrimination claims:

> [w]here direct evidence of discrimination is absent, a plaintiff establishes a circumstantial, prima facie case of racial discrimination based on disparate treatment by showing several things: "(1) [he] belongs to a racial minority; (2) [he] was subjected to adverse job action; (3) [his] employer treated similarly situated employees outside [his] classification more favorably; and (4) [he] was qualified to do the job."

330 F.3d 1313, 1316 (11th Cir. 2003), quoting *Holifield v. Reno*, 115 F.3d 1555, 1561-62 (11th Cir.1997). See also *McDonnell Douglas Corp. v. Green*, 411 U.S. 792,

---

*Lincoln v. Board of Regents*, 697 F.2d 928, 939 (11th Cir.1983)*, cert. denied*, 464 U.S. 826, 104 S.Ct. 97, 78 L.Ed.2d 102 (1983)*.*  A plaintiff asserting either claim must prove intentional discrimination.  *Id.*  Therefore, we need not discuss plaintiff's Title VII claims separately from his section 1981 and section 1983 claims.").  See also *Underwood v. Perry County Com'n*, 431 F.3d 788, 793 (11th Cir. 2005) ("Although the Supreme Court 'do[es] not regard as identical the constraints of Title VII and the Federal Constitution,' *Johnson v. Transp. Agency, Santa Clara County, Ca.*, 480 U.S. 616, 632, 107 S.Ct. 1442, 1452, 94 L.Ed.2d 615 (1987), '[w]hen section 1983 is used as a parallel remedy for violation . . . of Title VII, the elements of the two causes of action are the same.' *Hardin v. Stynchcomb*, 691 F.2d 1364, 1369 n. 16 (11th Cir.1982) (citing *Whiting v. Jackson State Univ.*, 616 F.2d 116, 123 (5th Cir.1980)). We, therefore, discuss these claims under the same framework.").

Furthermore, neither party addresses whether Defendant is a state actor subject to Plaintiff's Equal Protection claim under 42 U.S.C. § 1983.  However, Defendant has not disputed that it is subject to this claim, and by asserting his claim under § 1983, Plaintiff necessarily alleges that Defendant is a state actor.

93 S.Ct. 1817, 1824-25, 36 L.Ed.2d 668 (1973).

Defendant argues that Plaintiff cannot present a prima facie case of race discrimination under *Knight* because he has not shown that Defendant treated similarly situated employees outside his classification more favorably than himself.[11]

Plaintiff alleges that Defendant did, in fact, treat similarly situated employees outside his classification more favorably than it treated him.  He argues that Larry Pippins, supervisor of the Public Housing Department in 2004, was not fired after his department received "basically similar, or almost identical findings" on the RIM Review as the Section Eight department in 2003 and 2004.  (Pitts Dep. at 25). Plaintiff also alleges that Stan Thompson (hereinafter "Thompson") and Leonard Tuck (hereinafter "Tuck"), also black males employed by Defendant, were allowed to transfer to other departments to avoid termination, whereas Plaintiff was not given

---

[11]  Plaintiff argues that he has presented a prima facie case of race discrimination under a different standard, applied by the Eleventh Circuit Court in *Walker v. NationsBank of Florida N.A.,* 53 F.3d 1548 (11th Cir. 1995).  In *Walker*, the court applied the following elements to a race discrimination claim:  (1) membership in a protected class, (2) qualification for the position held, (3) termination, (4) and replacement with a person outside the protected class. 53 F.3d at 1556, citing *Rollins v. TechSOUTH, Inc.*, 833 F.2d 1525, 1532 n. 14 (11th Cir.1987).

While Plaintiff's prima facie case under *Walker* is apparently complete without evidence of more favorable treatment toward a similarly-situated employee, the court in *Walker* did find that evidence of a similarly-situated employee "is of probative value in determining whether [Defendant] intentionally discriminated against [Plaintiff]."  53 F.3d at 1557.  The *Walker* court addressed this issue as probative toward the plaintiff's showing of pretext in that case.  *Id.*  This element is, therefore, necessary to Plaintiff's burden of proof that Defendant intentionally discriminated against him.

this option.  (Id.).

In *Silvera v. Orange County School Bd.*, the Eleventh Circuit Court explained

that

> [i]n determining whether employees are similarly situated for purposes of
> establishing a prima facie case, it is necessary to consider whether the
> employees are involved in or accused of the same or similar conduct and are
> disciplined in different ways. . . .  In order to satisfy the similar offenses prong,
> the comparator's misconduct must be nearly identical to the plaintiff's in order
> "to prevent courts from second-guessing employers' reasonable decisions and
> confusing apples with oranges."

244 F.3d 1253, 1259 (11th Cir. 2001), quoting *Jones v. Bessemer Carraway Med.*

*Ctr.*, 137 F.3d 1306, 1311 (11th Cir. 1998), *opinion modified by* 151 F.3d 1321 (11th

Cir.1998); *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir.1997); *Maniccia v.*

*Brown,* 171 F.3d 1364, 1368-69 (11th Cir.1999).

In *Maniccia*, the Eleventh Circuit Court explained that

> [i]n evaluating whether employees are similarly situated for purposes of
> establishing a prima facie case of disparate treatment, is it necessary to
> consider whether the employees are involved in or accused of *the same or*
> *similar conduct* and are disciplined in different ways. . . .  The most important
> factors in the disciplinary context are the nature of the offenses committed and
> the nature of the punishment imposed. . . .  We require that the quantity and
> quality of the comparator's misconduct be nearly identical. . . .

171 F.3d at 1368. (Emphasis added).

Defendant argues that neither Pippins, Thompson, nor Tuck were similarly

situated to Plaintiff.  First, Pippins is the only individual among these three to hold

12

a supervisory position comparable to Plaintiff.  (Jones Aff. at 1-2).  Plaintiff's and Pippins's departments both received unfavorable RIM Reviews during the two years prior to Plaintiff's termination.  (Lundy Aff. at 2).  However, Defendant does not allege that it fired Plaintiff because of his department's RIM Review results.  Plaintiff was terminated due to conduct that Pippins did not even engage in, namely, the fifteen-point reduction in his department's SEMAP score after HUD's 2004 confirmatory audit.  (Lundy Aff. at 3).  Because the Public Housing Department was not subject to a HUD confirmatory audit in 2004, its satisfactory PHAS score of 89 did not change.[12]  (Id.).  The Public Housing Department under Pippins's supervision was not as at risk of earning a "troubled" status, with its companion HUD sanctions and loss of funding, as Plaintiff's Section Eight Department.  (Lundy Dep. Vol. 1 at 59-60).  Consequently, Pippins cannot accurately be said to have engaged in the same or similar conduct as Plaintiff without being terminated.  The court agrees with Defendant that Pippins was not similarly situated to Plaintiff.

Similarly, the court is unconvinced that Thompson and Tuck are similarly situated to Plaintiff.  Unlike Plaintiff, neither individual worked in a supervisory role for Defendant.  (Jones Aff. at 1-2).  Plaintiff does not argue that either Thompson or

---

[12]  Plaintiff does not allege, nor does the record indicate, that the PHAS score either would have or should have been reduced had it been subject to a HUD confirmatory audit that year.

Tuck was responsible for Defendant's SEMAP or PHAS scores or HUD's RIM Reviews.

Plaintiff offers no further evidence of a similarly situated employee of a different race who was treated more favorably by Defendant than himself.  He has therefore failed to present a prima facie case of race discrimination under *Knight*.

Even if Plaintiff has presented a prima facie case, his claims must fail because he has not shown that Defendant's legitimate, non-discriminatory reason for terminating him is a pretext for race discrimination.  The Eleventh Circuit Court has instructed that

> [i]f a prima facie case has been shown, then the defendant must "articulate some legitimate, nondiscriminatory reason for the [adverse employment action]."  If this is accomplished, the plaintiff may then attempt to demonstrate that the proffered reason was in fact merely a pretext for the defendant's actions.

*Silvera*, 244 F.3d at 1258, quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973), and citing *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981).

Defendant argues that it fired Plaintiff because of his poor job performance, not because of his race.  According to Defendant, the SEMAP score of 64--a thirty-two-point decline in two years under Plaintiff's supervision--was the main reason for his

termination.[13]

Plaintiff alleges that Defendant's asserted reason is a pretext to disguise race discrimination.  He argues that the reason is "beyond reasonable comprehension," and cannot be accepted by the court as Defendant's actual basis for terminating him.

In *Reeves v. Sanderson Plumbing Products, Inc.*, the United States Supreme Court explained that "[p]roof that the defendant's explanation is unworthy of credence is . . . one form of circumstantial evidence that is probative of intentional discrimination. . . ."  530 U.S. 133, 147, 120 S.Ct. 2097, 2108, 147 L.Ed.2d 105 (2000).

The Eleventh Circuit Court elaborated on this standard in *Cooper v. Southern Co.*, where it explained that,

> [t]o show that the employer's reasons were pretextual, the plaintiff must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence."

390 F.3d 695, 725 (11th Cir. 2004), quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir.1997).

Plaintiff offers several arguments in support of his contention that Defendant's

---

[13]  Defendant also cites to Plaintiff's failure to timely submit a renewal request on a housing contract in October 2004.  (Pl.'s exh. D). Plaintiff's late submission of the renewal request might have resulted in a refusal by HUD to fund that particular housing project. (Id.).

reason is pretextual.  First, he disputes that his job performance was poor.  According to Plaintiff, Lundy could not have been concerned about his job performance because he never counseled Plaintiff prior to his termination.  (Lundy Dep. Vol. 1 at 70). Lundy admits to not speaking with Plaintiff on the issue because he felt "the [SEMAP] score spoke for itself."  (Id.).

Plaintiff argues that this explanation is "unworthy of credence" because the score did not actually change the department's status to "troubled," nor did it lead to sanctions or the loss of funding by HUD.  HUD's confirmatory review contained no threat of future sanctions.  (Pl's exh. 40).  The review presented only findings, recommendations, and comments by HUD for Defendant to address.  (Id.).  The reduced SEMAP score had no effect on the Section Eight department's classification. (Id.). Plaintiff also alleges that the circumstances leading to the score were easily correctable, but he was not given an opportunity to remedy the problem before he was fired.

Further, while Defendant asserts the need to "act quickly" in terminating Plaintiff, Lundy actually knew about the score two months before he fired Plaintiff. (Lundy Dep. Vol. 1 at 62; Lundy Aff. at 3).  Again, however, Lundy never discussed the score with Plaintiff prior to his termination.  (Lundy Dep. Vol. 1 at 72).  Lundy admits he did not consider Plaintiff's previous favorable performance evaluations

before terminating him, explaining that the low SEMAP score justified his decision because of its threat to the future success of the Section Eight Department.  (Lundy Dep. Vol. 1 at 74).

Plaintiff also argues that Defendant's reason is unworthy of credence because Defendant interviewed only one applicant to replace him, a black female who had previously been fired from another housing authority, without checking her prior employment references.  (Lundy Dep. Vol. 1 at 73-74, 91, 95).

According to Defendant, Plaintiff has failed to show that its asserted reason was pretextual.  In *Moore v. Sears Roebuck and Co.*, the Eleventh Circuit Court explained that

> [i]t is well settled in employment discrimination cases . . . that for an employer to prevail the jury need not determine that the employer was correct in its assessment of the employee's performance; it need only determine that the defendant in good faith believed plaintiff's performance to be unsatisfactory and that the asserted reason for the discharge is therefore not a mere pretext for discrimination.

683 F.2d 1321, 1323 n.4 (11th Cir. 1982), citing *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Turner v. Texas Instruments, Inc.,* 555 F.2d 1251, 1256-57 & n.6 (5th Cir. 1977).  "'A plaintiff employee may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reason' as long as 'the reason is one that

17

might motivate a reasonable employer.'" *Pennington v. City of Huntsville*, 261 F.3d 1262, 1267 (11th Cir. 2001), quoting *Combs v. Plantation Patterns,* 106 F.3d 1519, 1543 (11th Cir.1997) ("[F]ederal courts do not sit to second-guess the business judgment of employers."). "It is by now axiomatic that we cannot second-guess the business decisions of an employer." *Rowell v. BellSouth Corp.*, 433 F.3d 794, 798 (11th Cir. 2005), citing *Wilson v. B/E Aerospace, Inc.,* 376 F.3d 1079, 1092 (11th Cir.2004). "The employer's stated legitimate reason . . . does not have to be a reason that the judge or jurors would act on or approve." *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1187 (11th Cir.1984), quoting *Loeb v. Textron, Inc.,* 600 F.2d 1003, 1012 n. 6. (1st Cir. 1979). Furthermore,

> A plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer. Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason.

*Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000), citing *Alexander v. Fulton County, Ga.*, 207 F.3d 1303, 1341 (11th Cir.2000).

Defendant argues that Plaintiff has failed to show a lack of good faith in Lundy's decision to terminate him. Instead, Plaintiff is apparently seeking to substitute his business judgment for Defendant's. Nevertheless, while Plaintiff argues that his termination was incomprehensible, he does not dispute that his department's

18

SEMAP score declined by thirty-two points in two years under his supervision, changing its classification from a "high performer" to within only five points of potential sanctions and reduced federal funding. (Pl.'s exh. D). Plaintiff argues that these circumstances would not motivate a reasonable employer to terminate him. Plaintiff appears to assert that a reasonable employer would have waited until the Section Eight Department was under a threat of sanctions and reduced funding before considering the need to terminate the head of that department. He does not address the fact that the SEMAP score had already declined seventeen points the previous year without resulting in his termination. (Pl.'s exh. D).

With regard to the hiring of Ms. Bradwell, Defendant explains that Lundy felt compelled to hire Plaintiff's replacement quickly after terminating Plaintiff because he was concerned that the department would continue its declining performance until it came under new management. (Lundy Dep. Vol. 1 at 139-141). Plaintiff alleges that Lundy hired Ms. Bradwell without checking her references. However, prior to her start date with Defendant, Lundy received a very favorable reference for Ms. Bradwell from Ann Lott, Senior Vice President of the Dallas Housing Authority, where Ms. Bradwell was employed until 2003.[14] (Lundy Dep. Vol. 1 at 115-16; Lott Aff. at 1).

---

[14] Defendant also argues that, despite the lack of other positive employment references for Ms. Bradwell, Lundy's decision to hire her was based on her wide-ranging experience in the public housing field. As stated in the above factual history, Ms. Bradwell's past employers

Furthermore, regardless of whether Plaintiff agrees with Lundy's wisdom in hiring Ms. Bradwell, he does not dispute that the Section Eight department improved substantially after she assumed responsibility over that program, receiving a SEMAP score of 79 and a positive report from HUD less than a year after she was hired. (Lundy Aff. at 3).

Plaintiff offers no further evidence that Defendant's asserted, non-discriminatory reason for firing him was pretextual. He has therefore failed to demonstrate a lack of good faith in Lundy's decision to terminate him. Consequently, the court finds that Plaintiff has not met his burden of showing that Defendant's legitimate, non-discriminatory reason for firing him was pretextual.

## V.   CONCLUSION

The court finds that Plaintiff has failed to present a prima facie case of race discrimination under the Eleventh Circuit's decision in *Knight v. Baptist Hosp. of Miami, Inc.* Plaintiff has also failed to show that Defendant's legitimate, non-discriminatory reason for terminating him was pretextual. Accordingly, Defendant's

---

include the Chattanooga Housing Authority, the Dallas Housing Authority, the Georgia Department of Community Affairs, and the Atlanta Housing Authority. (Pl's exhs. 21, 24, 26, 27). The record is void of any negative employment references for Ms. Bradwell. While Plaintiff argues that her termination from the Chattanooga Housing Authority discredits Lundy's decision to hire her based on her positive employment history, Lundy testified that Ms. Bradwell explained to his satisfaction the circumstances of her termination during her interview for Plaintiff's former position. (Lundy Dep. Vol. 1 at 77).

Motion for Summary Judgment is due to be **GRANTED.**  A separate Order will be entered.

      **DONE** and **ORDERED** this 22nd day of May, 2007.

 

**VIRGINIA EMERSON HOPKINS**
United States District Judge